J-S06002-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: D.A.C.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.N., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1953 EDA 2019 |

Appeal from the Order Entered June 13, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000387-2019

BEFORE:  LAZARUS, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:                    Filed: March 23, 2020

D.N. (Mother) appeals from the order terminating her parental rights to her two-year-old daughter, D.A.C.N.-A. (Child), pursuant to sections 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[1]  After our review, we affirm.

Child, born in February 2017, first came to the attention of the Philadelphia Department of Human Services (DHS) when Mother tested positive for phencyclidine (PCP) at the time of Child's birth.  At that time, Father was incarcerated.  DHS obtained a protective custody order and removed Child from Mother's care.  At the February 23, 2017 shelter care hearing, the court determined that Mother was receiving inpatient drug and

---

[1] The trial court also terminated the parental rights of H.B.C. (Father) on June 13, 2019.  Father's appeal is listed before a separate panel of this Court.

alcohol treatment at a mother/baby program, and the court ordered Child be reunified with Mother at the facility.

The case became active again in December 2017, following reports that the parents were under the influence of illicit drugs and that Father was verbally abusive. This incident triggered police intervention, after Father threatened to kill everyone at the scene. Police contacted DHS and Emergency Medical Services (EMS) to transport Child to St. Christopher's Hospital for Children for evaluation. Both Mother and Father attempted to remove Child from EMS, pulling on her arms and legs. DHS obtained a protective custody order. Child was evaluated and discharged from the hospital to a foster home.

Following a December 21, 2017 shelter care hearing, the court lifted the protective custody order. The court referred Mother to the Clinical Evaluation Unit (CEU) for a drug screen and granted Mother supervised visits at DHS with Child.

At a January 25, 2018 meeting, the Community Umbrella Agency (CUA)-NorthEast Treatment Center (NET) held an initial planning meeting, setting the goal of reunification with a concurrent goal of adoption. Mother's objectives were to comply with her CEU referral and subsequent recommendation, attend and complete domestic violence classes, obtain stable and appropriate housing, comply with court-ordered visitation, and complete parenting classes.

On February 1, 2018, the court adjudicated Child dependent.[2] The court found aggravated circumstances in that Mother's parental rights to another child had been involuntarily terminated on July 11, 2014. *See* 42 Pa.C.S.A. § 6302(5). The court referred Mother to CEU for drug and alcohol screens and dual diagnosis assessment (drug and alcohol/mental health), and to the Achieving Reunification Center (ARC) for appropriate services; the court also suspended Mother's visits with Child, issued an aggravated circumstances order, and ordered that DHS discontinue efforts toward reunification. *See* 42 Pa.C.S.A. § 6302(5) (aggravated circumstances exist where "parental rights of the parent have been involuntarily terminated with respect to a child of the parent); *see also Interest of S.U.*, 204 A.3d 949, 965 (Pa. Super. 2019) (where finding of aggravated circumstances exists, it is within juvenile court's discretion to determine whether reasonable efforts to prevent or eliminate need for removing child from home or to preserve and reunify family shall be made or continue to be made).

Throughout 2018 and early 2019, the court held several permanency review hearings. At the March 6, 2019 hearing, the court determined Mother was non-compliant with the permanency plan. In particular, she was inconsistent in her attendance at supervised visits and never progressed to

___

[2] Throughout the dependency case, Father failed to comply with the court-ordered permanency plan. In January 2019, Father was arrested on a bench warrant for a probation violation; he had been on probation following a 2015 guilty plea to burglary and conspiracy. Father was sentenced to eleven and one-half months' to twenty-three months' incarceration for the probation violation.

unsupervised contact with Child, she tested positive for drugs after completing a treatment program, and she relocated to New York City after Child entered foster care. Although Mother did not provide DHS with an address, she testified at the hearing that she was living in a two-bedroom apartment with her aunt and her cousin in New York, stated the address and indicated that her aunt had given her permission to live there. *See* N.T. Termination Hearing 6/13/19, at 45-46.

On May 28, 2019, DHS filed goal-change and termination petitions. On June 13, 2019, the court held a termination hearing. At that time, Child was two years old and had been in placement for eighteen months.

At the hearing, JoAnn Braverman, Esquire, represented Child as her Guardian *ad litem* (GAL), and Sharon Wallis, Esquire, represented Child as her Child Advocate Attorney. Mother was present at the hearing, represented by counsel, and she testified on her own behalf. Lashay Hickenbottom, CUA Case Manager, testified on behalf of DHS. At the conclusion of the hearing, the court terminated Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b). Mother filed this timely appeal. She raises the following issues for our review:

> 1. Did the trial court err in terminating [Mother's] parental rights under 23 Pa.C.S.A §§ 2511(a)(2), (a)(5) and (a)(8)?
>
> 2. Did the trial court err in finding that termination of Mother's parental rights best served [C]hild's developmental, physical and emotional needs under 23 Pa.C.S.A. § 2511(b)?

Appellant's Brief, at 4.

- 4 -

In reviewing an appeal from an order terminating parental rights,

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel–Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re I.E.P.*, 87 A.3d 340, 343–44 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012)).

A party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard that requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation and quotation marks omitted). Further,

> a parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

Mother argues DHS did not meet its burden of establishing grounds for termination by clear and convincing evidence under sections 2511(a)(2), (5) or (8), or establish that termination best served Child's needs and welfare pursuant to section 2511(b). We disagree.

The trial court's opinion thoroughly addresses subsections 2511(a)(1), (2), (5), and (8). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). In order to terminate parental rights under section 2511(a)(8), DHS must establish the following: (1) the child has been removed from parental care for [twelve]

months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). Under section 2511(b), the court must consider whether termination will meet Child's needs and welfare. 23 Pa.C.S.A. § 2511(b); *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006).

Our review of the hearing testimony and the record before us reveals that the trial court's decision to terminate Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(8) and (b) is supported by clear and convincing evidence. *See* Trial Court Opinion, 9/23/19, at 12-18 (at time of termination hearing, Child had been in DHS custody for eighteen months, Mother was minimally compliant with objectives, including visitation, tested positive for drugs after completing treatment program, and did not comply with court-ordered parenting capacity evaluation; with respect to section 2511(b), case manager testified that despite being "appropriate," Mother and Child were not bonded, Child is thriving in foster care and is "very attached" to foster parent, who had also adopted Child's biological sibling, termination "would not sever an existing and beneficial relationship with Mother[,]" and Child would not suffer irreparable harm if Mother's parental rights were terminated). *See also* N.T. Termination Hearing, *supra* at 15-25.

We agree with the trial court that Child deserves permanency and stability, and we find no abuse of discretion or error of law. *R.J.T.*, *supra*.

We affirm the order terminating Mother's parental rights, and we rely upon the opinion of the Honorable Joseph Fernandes.  The parties are directed to attach a copy of Judge Fernandes' opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/23/20</u>

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

2019 SEP 23 AM 10: 03

PRO PROTHY

| | | |
|---|---|---|
| In the Interest of D.A.C.-N., a Minor | : | CP-51-AP-0000387-2019 |
| | : | |
| | : | FID: 51-FN-004746-2011 |
| | : | |
| APPEAL OF: D.N., Mother | : | 1953 EDA 2019 |

**OPINION[1]**

**Fernandes, J.:**

Appellant D.N. ("Mother") appeals from the order entered on June 13, 2019, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's parental rights to D.A.C.-N. ("Child") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b). Carla Beggin, Esquire, counsel for Mother, ("Mother's Counsel") filed a timely Notice of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b) ("Statement of Errors") on July 12, 2019.

**Factual and Procedural Background:**

DHS originally became involved with this family on February 17, 2017, when DHS received a General Protective Services ("GPS") report that alleged Child and Mother tested positive for phencyclidine ("PCP") at the time of Child's birth on February 16, 2017; Child was born at 38.3 weeks gestation and weighed six pounds and seven ounces; Child was in the well-baby nursery and was not exhibiting any signs of drug withdrawal; Mother denied PCP use and stated that someone must have given her the drug without her knowledge; Child's sibling ("Sibling") was adopted in 2016; Mother received Department of Public Welfare benefits; Mother requested paperwork to apply for Women, Infants, and Children benefits; Mother resided with Maternal Aunt; Mother had previously been incarcerated in 2016 but had no pending legal matters; Mother was diagnosed with post-traumatic stress disorder ("PTSD"), bipolar disorder, depression, and anxiety; Mother reported that she received mental health treatment through Community Behavioral

---

[1] The trial court requested the Notes of Testimony for June 13, 2019, on July 10, 2019. The trial court made subsequent requests on August 13, 2019, and August 27, 2019. The trial court received the Notes of Testimony on August 28, 2019.

*AP. B*

Health ("CBH"); Mother was previously prescribed medication but had not filled the prescription; Mother stated that she was prepared to care for Child; and Father was incarcerated[2]. This report was determined to be valid. On that same date, DHS visited Mother and Child at Pennsylvania Hospital to investigate the allegations of the GPS report. Mother denied that she used drugs and stated that she attended a party on February 14, 2017, where she smoked a cigarette that had been given to her, which she believed had been laced with drugs. Mother also explained that similar circumstances explained her two prior positive drug screens. Mother indicated that she resided with Maternal Aunt and a friend ("Friend") and that she was prepared to care for Child. DHS learned that Child was not experiencing any symptoms of withdrawal. Subsequently, DHS visited Mother's home and met with Maternal Aunt. DHS determined that the home was appropriate and that Mother, Maternal Aunt, and Friend each rented a room in the home of Friend's father, who was also a household member. Maternal Aunt and Friend denied any drug use; however, DHS learned that Maternal Aunt had previously lost custody of her children due to a history of drug use and lack of supervision. On February 21, 2017, DHS learned that Child was ready for discharge. DHS obtained an Order of Protective Custody ("OPC") for Child. Child was subsequently placed with Maternal Great-Grandmother ("MGGM"). On that same date, DHS learned that Mother entered an inpatient drug treatment program at Interim House West. DHS subsequently visited Interim House West and met with Mother as well as the program director. The program director confirmed that Mother had been admitted to an inpatient mother/baby drug and alcohol program.

A shelter care hearing was held for Child on February 23, 2017. Mother was present for this hearing. The trial court[3] lifted the OPC and discharged the temporary commitment to DHS and Child's dependency matter. The trial court determined that Mother was receiving inpatient drug and alcohol treatment at a mother/baby program, and ordered that Child be reunified with Mother at the facility. On that same date, Child was returned to Mother's care at Interim House West.

On December 7, 2017, DHS received a GPS report that alleged Mother and Father took Child to

---

[2] Father's parental rights were also involuntarily terminated by the trial court on June 13, 2019. Father filed a Notice of Appeal on July 10, 2019. (1950 EDA 2019). The trial court responded to Father's appeal by filing a separate opinion on September 11, 2019.

[3] For the hearing held on February 23, 2017, the trial judge assigned to this matter was the Honorable Vincent Furlong, while the matter was heard by Master Alexis Ciccone. For the hearing held on December 21, 2017, the trial judge assigned to this matter was the Honorable Jonathan Irvine. Between January 4, 2018, and June 19, 2018, the trial judge assigned to this matter was the Honorable Lyris Younge. From September 5, 2018 to the present, this matter is assigned to the Honorable Joseph Fernandes.

Maria De Los Santos Health Center for a well-child visit; Mother appeared to be under the influence of drugs although Father did not appear to be impaired; Mother appeared drowsy and sleepy; Mother denied being under the influence of alcohol or drugs; Child had previously been examined on October 25, 2017 and that Mother appeared to be under the influence of drugs at that examination as Mother's speech was slurred and she asked repetitive questions; Mother had a history of PCP and marijuana use; there was a history of domestic violence between Mother and Father; and Mother may suffer from depression. This report was determined to be valid. On December 19, 2017, DHS received a supplemental GPS report that alleged Mother and Father were involved in a verbal altercation; Mother and Father were under the influence of drugs; Father admitted that he and Mother had been smoking PCP and marijuana; the Philadelphia Police Department ("PPD") was called to the home; the family was informed that DHS had been contacted; Emergency Medical Services ("EMS") were contacted to transport Child to St. Christopher's Hospital for Children for an evaluation; Mother and Father attempted to physical remove Child from the EMS workers by pulling on her arms and legs; Mother and Father engaged the PPD in a physical altercation after Child was removed from the scene; medical personnel determined Child was healthy and well-fed. DHS subsequently learned that Children's Hospital was ready to discharge Child and DHS subsequently obtained an OPC for Child, who remained hospitalized on a social hold while DHS located an appropriate foster care placement. On December 19, 2017, Child was placed in a foster home through Bethany Christian Services.

A shelter care hearing was held for Child on December 21, 2017. Mother was present for this hearing. The trial court lifted the OPC and ordered the temporary commitment to DHS to stand. Mother was referred to the Clinical Evaluation Unit ("CEU") for a forthwith drug screen. Mother was granted supervised visits at the agency with Child.

On January 25, 2018, the Community Umbrella Agency ("CUA") NorthEast Treatment Centers ("NET") held the initial Single Case Plan ("SCP") meeting. Mother did not participate in this meeting. Child's primary goal was reunification with a concurrent goal of adoption. Mother's objectives were to comply with her CEU referral and subsequent recommendations; attend and complete domestic violence classes; obtain stable and appropriate housing; comply with court-ordered visitation; and complete parenting classes.

On February 1, 2018[4], the trial court adjudicated Child dependent, discharged the temporary commitment, and fully committed Child to DHS. The trial court found that aggravated circumstances existed pursuant to 42 Pa.C.S. §6302(5) in that Mother's parental rights of Sibling were involuntarily terminated by the Honorable Jonathan Q. Irvine on July 11, 2014. The trial court ordered Mother be referred to the CEU for a forthwith drug and alcohol screen, dual diagnosis assessment, and three random drug screens. The trial court also referred Mother to the Achieving Reunification Center ("ARC") for appropriate services. The trial court ordered that a SCP meeting be held within the next 20 days, Mother's visits with Child were to be suspended until further order of the court. Additionally, the trial court issued an Aggravated Circumstances Order on the same date, ordering no efforts to be made to reunify Child with Mother.

A permanency review hearing was held for Child on April 19, 2018. Mother was present for this hearing. It was determined that Mother was non-compliant with the permanency plan and that Mother reported that she was engaged in ARC services, but CUA-NET did not have a record of Mother's engagement. The trial court ordered Child remain as committed to DHS and Mother be referred to the CEU for a forthwith drug and alcohol screen, dual diagnosis assessment, and three random drug screens. The trial court ordered that Mother's visitation with Child remain suspended, but once Mother engaged in dual diagnosis treatment and submitted at least two consecutive negative drug screens with progress notes and treatment plans, Mother was to have supervised visits at the agency.

A permanency review hearing was held for Child on June 19, 2018. Mother was present for this hearing. The trial court learned that the CEU did not recommend substance abuse treatment for Mother, but did refer Mother to the Behavioral Health System ("BHS") due to her reported mental health history. The trial court ordered Child remain as committed; Mother sign all releases; Mother's therapist was to provide a treatment plan and progress notes forthwith; Mother was again ordered to be referred to the CEU for a forthwith drug and alcohol screen; and Mother's visitation with Child remain suspended, but if Mother's therapist recommended visitation, visits were to begin immediately at DHS.

---

[4] The adjudicatory hearing was originally scheduled for January 4, 2018, and again on January 18, 2018. On both dates, the adjudicatory hearing was continued due to the unavailability of the trial court judge and issues with the trial court internet system.

On July 24, 2018, the SCP was revised. Mother participated in this meeting by telephone. Child's primary goal was reunification with the concurrent goal of adoption. Mother's objectives remained the same with the addition of continuing to attend her substance abuse and mental health treatment, as recommended.

A permanency review hearing was held for Child on September 5, 2018[5]. Mother was present for this hearing. The trial court determined that Mother was substantially compliant with the permanency plan; Mother completed domestic violence and parenting programs; and Mother was engaged in mental health and substance abuse treatment. The trial court ordered Child to remain committed as placed; Mother be referred to the CEU for a forthwith drug and alcohol screen with three random drug screens; Mother to complete a parenting capacity evaluation ("PCE"); and Judge Fernandes reinstated Mother's visits bi-weekly, three-house supervised at the agency with Child.

On October 17, 2018, the SCP was revised. Mother did not participate in this meeting. Child's primary goal was reunification with the concurrent goal of adoption. Mother's objectives remained the same.

A permanency review hearing was held for Child on December 5, 2018. Mother was present for this hearing. It was determined that Mother was minimally compliant with the permanency plan, Mother was receiving mental health treatment, and that Mother appeared to be under the influence of drugs or alcohol during a supervised visit with Child on October 15, 2018, which Mother attributed to her medication. The trial court ordered that Child remain as committed; Mother be referred to the CEU for a forthwith drug and alcohol screen and three random drug screens; Mother provide a treatment plan and progress report; and Mother is to comply with her PCE referral.

A permanency review hearing was held for Child on March 6, 2019. Mother was present for this hearing. The trial court determined that Mother was non-compliant with the permanency plan; Mother was not participating in visitation with Child; Mother was scheduled for a PCE on February 20, 2019, but Mother failed to attend the appointment; Mother completed domestic violence, anger

---

[5] A status review hearing was scheduled for June 26, 2018. The case was continued due to DHS's request for the matter to be heard by the trial court judge.

management, and an inpatient substance abuse treatment through Cornerstone Treatment Facilities. Mother tested positive for marijuana after completing the inpatient program. The trial court ordered Child remain as committed; Mother be referred to the CEU for a forthwith drug and alcohol screen, dual diagnosis assessment again, and three random drug screens; Mother provide a treatment plan and progress report; Mother reschedule her PCE; Mother comply with all services and recommendations; Mother sign all releases and consents; DHS to file an involuntary termination of parental rights ("TPR") petition to be filed as to Mother; and that CUA-NET explore voluntary relinquishment of parental rights with Mother.

On April 11, 2019, the SCP was revised. Mother did not participate in this meeting. Child's primary goal was identified as adoption with the concurrent goal of permanent legal custody ("PLC"). Mother's objectives were to provide documentation of her completion of substance abuse treatment; complete random drug screens; obtain stable and appropriate housing; comply with court-ordered visitation; and to complete her PCE.

Child has been in DHS care since December 19, 2017. Mother has failed to successfully comply with all of her objectives and comply with all court orders throughout the life of the case. DHS filed TPR and goal change petitions as to Mother on May 28, 2019.

On June 13, 2019, the trial court held the termination trial[6] for Child. Mother was present for this trial. The trial court found clear and convincing evidence to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b). On July 12, 2019, Mother's Counsel filed this appeal on behalf of Mother.

### Discussion:
On appeal, Appellant-Mother represents that the trial court erred when it found that:

1. DHS by clear and convincing evidence had met its burden to terminate Appellant's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), and (8).[7]

---

[6] The trial was for both termination of parental rights and goal change of Child. Mother did not appeal the goal change of reunification to adoption.

[7] Mother's Statement of Errors indicates that the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1) on June 13, 2019. The trial court only terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b). Since Mother's parental rights were not terminated pursuant to 23 Pa.C.S.A. §2511(a)(1), this Opinion will not address this issue.

2. The termination of Mother's parental rights was in Child's best interests and DHS had met its burden pursuant to 23 Pa.C.S.A. §2511(b).

Mother's Counsel only filed a Notice of Appeal for the June 13, 2019 trial court order that terminated Mother's parental rights. Mother's Counsel did not file a Notice of Appeal of the June 13, 2019 trial court order changing Child's permanency goal from reunification to adoption. A party waives their right to appeal an order if notice of the appeal is not filed within 30 days after the entry of the relevant order. *Koken v Colonial Assur. Co.*, 885 A.2d 1078, 1101 (Pa Cmwlth. 2005). Since Mother has failed to file a Notice of Appeal for the June 13, 2019 trial court order changing Child's permanency goal, Mother has waived her right to appeal the goal change. For the purpose of this opinion, Mother's issues 1 through 5 will be consolidated to read: Did the trial court err or abuse its discretion when it terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b)? Mother has appealed the involuntary termination of her parental rights.

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a). In proceedings to involuntarily terminate parental rights the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). The trial court terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Throughout the time that Child has been in the custody of DHS, Mother's SCP objectives were dual diagnosis, random drug screens, housing, complete a PCE, and visitation. (N.T. 06/13/19, pgs. 7-8, 10, 12). Mother has attended almost all permanency review hearings for the life of the case and she is aware of her objectives. (N.T. 06/13/19, pg. 7; DHS Exhibit 7-15). On February 1, 2018, the trial court found aggravated circumstances existed and no efforts were to be made to

reunify Child with Mother. (N.T. 06/13/19, pg. 70). Prior to the permanency review hearing on March 6, 2019, Mother completed domestic violence, employment, and parenting. (N.T. 06/13/19, pgs. 46-47; Mother Exhibit 2-4). Mother completed an inpatient drug and alcohol program at Cornerstone Treatment Center in New York on February 2019. (N.T. 06/13/19, pgs. 30, 38-39, 57-58; Mother Exhibit 1). Mother did not fulfill the mental health component of her dual diagnosis objective at this provider. (N.T. 06/13/19, pg. 48). Mother attempted to enroll in a mental health program in New York City and eventually obtained an appointment on May 2019. Mother was diagnosed with bipolar disorder, PTSD, depression, and anxiety. Mother is scheduled to attend therapy once a week and consult with a psychiatrist for medication within two weeks of June 13, 2019, after the termination trial. Mother has been off her medication for this entire time period. (N.T. 06/13/19, pgs. 76-80). Although Mother completed the inpatient drug and alcohol program, Mother tested positive for marijuana at a forthwith drug screen at the CEU on March 6, 2019. (N.T. 06/13/19, pgs. 13-14, 30). On that same date, Mother refused to schedule an assessment, as ordered, because Mother indicated to the CEU that since she lives in New York City, the trial court should have considered that fact prior to making the order. Mother also refused to schedule the assessment for a future date that coincides with a date that Mother travels to Philadelphia to visit Child. Mother indicated that she does not recall refusing to schedule the assessment with the CEU. (N.T. 06/13/19, pgs. 13-14, 61, 64-65). Following Mother's discharge from Cornerstone Treatment Center in February 2019, Mother did not participate in any other drug and alcohol treatment. (N.T. 06/13/19, pgs. 11-12, 57-61). Mother still has not complied with the court order to be re-assessed at the CEU. (N.T. 06/13/19, pg. 65). After the permanency review hearing on March 6, 2019, CUA contacted Mother to attend her random drug screens on April 17, 2019, May 16, 2019, and May 29, 2019. Mother chose to avail herself to the CEU for drug screens on May 13, 2019, and June 3, 2019. (N.T. 06/13/19, pgs. 14-15). Mother claimed that CUA never contacted her to attend random drug screens, but later stated that she couldn't attend the random drug screen within 24 hours of notification due to her work schedule and lack of money to get to Philadelphia. (N.T. 06/13/19, pgs. 66-68). On the day of her visit with Child on April 29, 2019, Mother did come to the courthouse to provide a drug screen, but she left without giving the screen, nor did she provide any documentation that she is maintaining her sobriety. (N.T. 06/13/19, pgs. 73-75). For the life of the case, Mother has been in and out of shelters and treatment programs. Mother currently resides in New York City with a maternal aunt and a maternal cousin. CUA indicated that Mother does not

have appropriate housing for Child to be reunified with Mother. (N.T. 06/13/19, pgs. 9-10, 30-31, 45-46). Mother had a scheduled PCE on February 20, 2019. Although Mother was aware of the scheduled PCE, Mother arrived late to the appointment and the PCE was unable to be completed as scheduled. Mother has not completed the PCE. (N.T. 06/13/19, pg. 10). Between Child's adjudication on February 1, 2018 and September 5, 2018, Mother's visits with Child were suspended. (DHS Exhibits 7-13). After the trial court reinstated visitation on September 5, 2018, supervised visits were scheduled with Mother and Child bi-weekly on Mondays. CUA indicated that between the permanency review hearing on March 6, 2019, and the termination and goal change trial on June 13, 2019, Mother only attended two visits. Mother informed CUA that she missed scheduled visits with Child due to her work schedule. (N.T. 06/13/19, pgs. 8-9). Mother claims that she has attended four visits since the permanency review hearing on March 6, 2019, and missed only one date due to the agency's closure on Memorial Day. (N.T. 06/13/19, pgs. 55-56). Mother's visitation with Child has never graduated beyond supervised visitation. (N.T. 06/13/19, pgs. 15-16). Although CUA indicated that the visits between Mother and Child are appropriate, CUA stated that Child is unfamiliar with Mother. Child is quiet and timid while Mother has high levels of energy during the visits. (N.T. 06/13/19, pgs. 9, 16, 40-41). Mother has been minimally compliant with her objectives. (NT. 06/13/19, pg. 15). Child needs permanency, which Mother cannot provide. Mother has demonstrated that she is unwilling to provide Child with essential parental care, control, or subsistence necessary for her physical and mental well-being. The conditions and causes of mother's incapacity cannot or will not be remedied by Mother. Mother had ample opportunity to put herself in a position to parent. DHS was not required to provide reasonable efforts to Mother for reunification due to the previous involuntary termination of Mother's parental rights with respect to another child. (N.T. 06/13/19, pgs. 94-95; DHS Exhibit 7). The testimony of the DHS witness was credible. Mother's repeated and continued incapacity has not been mitigated. Termination under 23 Pa.C.S.A. §2511(a)(2) was proper.

Mother also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions

leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

Child has been in DHS custody since December 21, 2017, eighteen months at time of the termination trial on June 13, 2019. Mother's SCP objectives were dual diagnosis, random drug screens, housing, complete a PCE, and visitation. (N.T. 06/13/19, pgs. 7-8, 10, 12). Mother has attended almost all permanency review hearings for the life of the case and she is aware of her objectives. (N.T. 06/13/19, pg. 7; DHS Exhibit 7-15). Prior to the permanency review hearing on March 6, 2019, Mother completed domestic violence, employment, and parenting. (N.T. 06/13/19, pgs. 46-47; Mother Exhibit 2-4). Mother completed an inpatient drug and alcohol program at Cornerstone Treatment Center in New York on February 2019. (N.T. 06/13/19, pgs. 30, 38-39; Mother Exhibit 1). Mother did not fulfill the mental health component of her dual diagnosis objective at this provider. (N.T. 06/13/19, pg. 48). Mother attempted to enroll in a mental health program in New York City and eventually obtained an appointment on May 2019. Mother was diagnosed with bipolar disorder, PTSD, depression, and anxiety. Mother is scheduled to attend therapy once a week and consult with a psychiatrist for medication within two weeks of June 13, 2019, after the termination trial. Mother has been off her medication for this entire time period. (N.T. 06/13/19, pgs. 76-80). Although Mother completed the inpatient drug and alcohol program, Mother tested positive for marijuana at a forthwith drug screen at the CEU on March 6, 2019. (N.T. 06/13/19, pgs. 13-14, 30). On that same date, Mother refused to schedule an assessment, as ordered, because Mother indicated to the CEU that since she lives in New York City, the trial court should have considered that fact prior to making the order. Mother also refused to schedule the assessment for a future date that coincides with a date that Mother travels to Philadelphia to visit

Child. Mother indicated that she does not recall refusing to schedule the assessment with the CEU. (N.T. 06/13/19, pgs. 13-14, 61, 64-65). Following Mother's discharge from Cornerstone Treatment Center in February 2019, Mother did not participate in any other drug and alcohol treatment. (N.T. 06/13/19, pgs. 11-12, 57-61). Mother still has not completed the court-ordered re-assessment at the CEU. (N.T. 06/13/19, pg. 65). After the permanency review hearing on March 6, 2019, CUA contacted Mother to attend her random drug screens on April 17, 2019, May 16, 2019, and May 29, 2019. Mother chose to avail herself to the CEU for drug screens on May 13, 2019, and June 3, 2019. (N.T. 06/13/19, pgs. 14-15). Mother claimed that CUA never contacted her to attend random drug screens, but later stated that she couldn't attend the random drug screen within 24 hours of notification due to her work schedule and lack of money to get to Philadelphia. (N.T. 06/13/19, pgs. 66-68). When Mother came to Philadelphia for a visit with Child on April 29, 2019, Mother came to the courthouse for a drug screen but left without giving the screen or providing any documentation that shows that she is maintaining her sobriety. (N.T. 06/13/19, pgs. 73-75). For the life of the case, Mother has been in and out of shelters and treatment programs. Mother currently resides in New York City with a maternal aunt and a maternal cousin. CUA indicated that Mother does not have appropriate housing for Child to be reunified with Mother. (N.T. 06/13/19, pgs. 9-10, 30-31, 45-46). Mother had a scheduled PCE on February 20, 2019. Although Mother was aware of the scheduled PCE, Mother arrived late to the appointment and the PCE was unable to be completed as scheduled. Mother has not completed the PCE. (N.T. 06/13/19, pg. 10). Between Child's adjudication on February 1, 2018 and September 5, 2018, Mother's visits with Child were suspended. (DHS Exhibits 7-13). After the trial court reinstated visitation on September 5, 2018, supervised visits were scheduled with Mother and Child bi-weekly on Mondays. CUA indicated that between the permanency review hearing on March 6, 2019, and the termination and goal change trial on June 13, 2019, Mother only attended two visits. Mother informed CUA that she missed scheduled visits with Child due to her work schedule. (N.T. 06/13/19, pgs. 8-9). Mother claims that she has attended four visits since the permanency review hearing on March 6, 2019, and missed only one date due to the agency's closure on Memorial Day. (N.T. 06/13/19, pgs. 55-56). Mother's visitation with Child has never graduated beyond supervised visitation. (N.T. 06/13/19, pgs. 15-16). Although CUA indicated that the visits between Mother and Child are appropriate, CUA stated that Child does not recognize Mother. Child is quiet and timid while Mother has high levels of energy during the visits. (N.T. 06/13/19, pgs. 9, 16, 40-41). Mother has

been minimally compliant with her objectives. (NT. 06/13/19, pg. 15). Child is currently placed in a pre-adoptive foster home. Child recognizes her foster parent as her caregiver. (N.T. 06/13/19, pg. 17). Child is placed in the same home as a biological sibling that was previously adopted by Child's current foster parent with whom she shares a strong bond. (N.T. 06/13/19, pgs. 18, 24, 34). Child is currently receiving early speech intervention due to development delays and currently attends daycare. (N.T. 06/13/19, pgs. 25, 89). The foster parent takes Child to all of her medical appointments. Mother has not participated in any Child's medical appointments. (N.T. 06/13/19, pgs. 17-18). Child is strongly bonded with the foster parent and shows affection toward the foster parent. (N.T. 06/13/19, pgs. 17, 89). Child needs permanency, which Mother is unable to provide. As a result, the trial court found that termination of Mother's parental rights was in the best interest of Child for her physical, intellectual, moral, and spiritual well-being. DHS was not required to provide reasonable efforts to Mother for reunification due to the previous involuntary termination of Mother's parental rights with respect to another child. (N.T. 06/13/19, pgs. 94-95; DHS Exhibit 7). The testimony of the DHS witness was credible. Termination best serves Child's needs and welfare. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(5) was also proper.

The trial court also terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security, and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Child has been in DHS custody since December 21, 2017, eighteen months at time of the termination trial on June 13, 2019. Mother's SCP objectives were dual diagnosis, random drug screens, housing, complete a PCE, and visitation. (N.T. 06/13/19, pgs. 7-8, 10, 12). Mother has attended almost all permanency review hearings for the life of the case and she is aware of her objectives. (N.T. 06/13/19, pg. 7; DHS Exhibit 7-15). Prior to the permanency review hearing on March 6, 2019, Mother completed domestic violence, employment, and parenting. (N.T. 06/13/19, pgs. 46-47; Mother Exhibit 2-4). Mother completed an inpatient drug and alcohol program at Cornerstone Treatment Center in New York on February 2019. (N.T. 06/13/19, pgs. 30, 38-39; Mother Exhibit 1). Mother did not fulfill the mental health component of her dual diagnosis objective at this provider. (N.T. 06/13/19, pg. 48). Mother attempted to enroll in a mental health program in New York City and eventually obtained an appointment on May 2019. Mother was diagnosed with bipolar disorder, PTSD, depression, and anxiety. Mother is scheduled to attend therapy once a week and consult with a psychiatrist for medication within two weeks of June 13, 2019, after the termination trial. Mother has been off her medication for this entire time period. (N.T. 06/13/19, pgs. 76-80). Although Mother completed the inpatient drug and alcohol program, Mother tested positive for marijuana at a forthwith drug screen at the CEU on March 6, 2019. (N.T. 06/13/19, pgs. 13-14, 30). On that same date, Mother refused to schedule an assessment, as ordered, because Mother indicated to the CEU that since she lives in New York City, the trial court should have considered that fact prior to making the order. Mother also refused to schedule the assessment for a future date that coincides with a date that Mother travels to Philadelphia to visit Child. Mother indicated that she does not recall refusing to schedule the assessment with the CEU. (N.T. 06/13/19, pgs. 13-14, 61, 64-65). Following Mother's discharge from Cornerstone Treatment Center in February 2019, Mother did not participate in any other drug and alcohol treatment. (N.T. 06/13/19, pgs. 11-12, 57-61). Mother still has not completed the court-ordered re-assessment at the CEU. (N.T. 06/13/19, pg. 65). After the permanency review hearing on March 6, 2019, CUA contacted Mother to attend her random drug screens on April 17, 2019, May 16, 2019, and May 29, 2019. Mother chose to avail herself to the CEU for drug screens on May 13, 2019, and June 3, 2019. (N.T. 06/13/19, pgs. 14-15). Mother claimed that CUA never contacted her to attend random drug screens, but later stated that she couldn't attend the random drug screen within 24 hours of notification due to her work schedule and lack of money to get to Philadelphia. (N.T. 06/13/19, pgs. 66-68). On April 29, 2019, Mother came to the courthouse for an unscheduled drug screen,

but left without giving the screen and failed to provide any documentation that shows that she is maintaining her sobriety. (N.T. 06/13/198, pgs. 73-75). For the life of the case, Mother has been in and out of shelters and treatment programs. Mother currently resides in New York City with a maternal aunt and a maternal cousin. CUA indicated that Mother does not have appropriate housing for Child to be reunified with Mother. (N.T. 06/13/19, pgs. 9-10, 30-31, 45-46). Mother had a scheduled PCE on February 20, 2019. Although Mother was aware of the scheduled PCE, Mother arrived late to the appointment and the PCE was unable to be completed as scheduled. Mother has not completed the PCE. (N.T. 06/13/19, pg. 10). Between Child's adjudication on February 1, 2018 and September 5, 2018, Mother's visits with Child were suspended. (DHS Exhibits 7-13). After the trial court reinstated visitation on September 5, 2018, supervised visits were scheduled with Mother and Child bi-weekly on Mondays. CUA indicated that between the permanency review hearing on March 6, 2019, and the termination and goal change trial on June 13, 2019, Mother only attended two visits. Mother informed CUA that she missed scheduled visits with Child due to her work schedule. (N.T. 06/13/19, pgs. 8-9). Mother claims that she has attended four visits since the permanency review hearing on March 6, 2019 and missed only one date due to the agency's closure on Memorial Day. (N.T. 06/13/19, pgs. 55-56). Mother's visitation with Child has never graduated beyond supervised visitation. (N.T. 06/13/19, pgs. 15-16). Although CUA indicated that the visits between Mother and Child are appropriate, CUA stated that Child is unfamiliar with Mother. Child is quiet and timid while Mother has high levels of energy during the visits. (N.T. 06/13/19, pgs. 9, 16, 40-41). Mother has been minimally compliant with her objectives. (NT. 06/13/19, pg. 15). Child is currently placed in a pre-adoptive foster home. Child recognizes her foster parent as her caregiver. (N.T. 06/13/19, pg. 17). Child is placed in the same home as a biological sibling that was previously adopted by Child's current foster parent with whom she shares a strong bond. (N.T. 06/13/19, pgs. 18, 24, 34). Child is currently receiving early speech intervention due to development delays and currently attends daycare. (N.T. 06/13/19, pgs. 25, 89). The foster parent takes Child to all of her medical appointments. Mother has not participated in any Child's medical appointments. (N.T. 06/13/19, pgs. 17-18). Child is strongly bonded with the foster parent and shows affection toward the foster parent. (N.T. 06/13/19, pgs. 17, 89). As a result, the trial court found that termination of Mother's parental rights was in the best interest of Child for her physical, intellectual, moral, and spiritual well-being. Mother has been unable to place herself in a position to parent for the life of the case. The conditions which

led to the removal of Child continue to exist after eighteen months and termination of Mother's parental rights would best serve the needs and welfare of Child. The testimony of DHS witness was credible. DHS was not required to provide reasonable efforts to Mother for reunification due to the previous involuntary termination of Mother's parental rights with respect to another child. (N.T. 06/13/19, pgs. 94-95; DHS Exhibit 7). Because the record contains clear and convincing evidence, the trial court did not abuse its discretion and termination under 23 Pa.C.S.A. §2511(a)(8) was also proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination of C.W.S.M.* and *K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K. Zs.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care, if found to be beyond the control of the parent. Beyond the presence of a bond between a parent and child, the trial court can equally emphasize the safety and needs of the child, and should consider the intangible, such as the love, comfort, security, and stability that the child might have with their foster parent. *In re Adoption of C.D.R.*, 11 A.3d 1212, 1219 (Pa. Super. 2015).

Between Child's adjudication on February 1, 2018 and September 5, 2018, Mother's visits with Child were suspended. (DHS Exhibits 7-13). After the trial court reinstated visitation on September 5, 2018, supervised visits were scheduled with Mother and Child bi-weekly on Mondays. CUA indicated that between the permanency review hearing on March 6, 2019, and the termination and goal change trial on June 13, 2019, Mother only attended two visits. Mother informed CUA that she missed scheduled visits with Child due to her work schedule. (N.T. 06/13/19, pgs. 8-9). Mother claims that she has attended four visits since the permanency review hearing on March 6, 2019,

and missed only one date due to the agency's closure on Memorial Day. (N.T. 06/13/19, pgs. 55-56). Mother averages two visits per court cycle review since her visits were reinstated on September 5, 2018. (N.T. 06/13/19, pg. 31). Mother's visitation with Child has never graduated beyond supervised visitation. (N.T. 06/13/19, pgs. 15-16). Although CUA indicated that the visits between Mother and Child are appropriate, CUA stated that Child is unfamiliar with Mother. Child is quiet and timid while Mother has high levels of energy during the visits. (N.T. 06/13/19, pgs. 9, 16, 40-41). Mother and Child are not well-bonded. Child can recognize Mother, but Mother and Child do not have a strong relationship. (N.T. 06/13/19, pgs. 15, 16). Mother and Child do not have a parent-child relationship. (N.T. 06/13/19, pgs. 16-17). Child is currently placed in a pre-adoptive foster home. Child recognizes her foster parent as her caregiver. (N.T. 06/13/19, pg. 17). Child is placed in the same home as a biological sibling that was previously adopted by Child's current foster parent with whom she shares a strong bond. (N.T. 06/13/19, pgs. 18, 24, 34). Child is currently receiving early speech intervention due to development delays and currently attends daycare. (N.T. 06/13/19, pgs. 25, 89). The foster parent takes Child to all of her medical appointments. Mother has not participated in any Child's medical appointments. (N.T. 06/13/19, pgs. 17-18). Child is strongly bonded with the foster parent and shows affection toward the foster parent. (N.T. 06/13/19, pgs. 17, 89). It is in Child's best interest for Mother's parental rights to be involuntarily terminated and Child would not suffer any irreparable harm from the termination. (N.T. 06/13/19, pgs. 18-19). Child was appointed legal counsel ("Legal Counsel") and Legal Counsel met with Child and had the chance to observe Child. Although Child is three-years-old, Child is non-verbal due to developmental delays and foster parent indicated that Child can be shy when meeting new people. Legal Counsel observed that Child appeared shy and held onto the foster parent during the meeting. Although Legal Counsel was unable to discuss Child's wishes directly with Child, Legal Counsel noted that Child appeared happy. Legal Counsel briefly met Child's biological sibling and observed that the sibling appeared to be happy in the environment. Legal Counsel indicated that the foster home appeared to be a positive environment and noticed a strong relationship between the foster parent and Child. (N.T. 06/13/19, pgs. 89-90). The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Mother. DHS was not required to provide reasonable efforts to Mother for reunification due to the previous involuntary termination of Mother's parental rights with respect to another child. (N.T. 06/13/19, pgs. 94-95; DHS Exhibit 7). The DHS witness was

credible. The trial court's termination of Mother's parental rights to Child under 23 Pa.C.S.A. §2511(b) was proper and there was no error of law or an abuse of discretion.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b), since it would best serve Child's emotional needs and welfare. The trial court's involuntary termination of Mother's parental rights was proper and should be affirmed.

By the court,

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

In the Interest of D.A.C.-N., a Minor   :    CP-51-AP-0000387-2019

                                                :    FID:   51-FN-004746-2011

APPEAL OF: D.N., Mother            :    1953 EDA 2019

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Opinion upon all parties or their counsel on September 23, 2019. The names and addresses of all persons served are as follows:

Roberto Valdes, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102
Attorney for D.H.S.

Carla Beggin, Esq.
1800 John F. Kennedy Blvd, Suite 300
Philadelphia, Pennsylvania 19103
Attorney for Mother

Sharon K. Wallis, Esq.
640 Rodman Street
Philadelphia, Pennsylvania 19147
Child Advocate

Jo Ann Braverman, Esq.
1500 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19102
Guardian Ad Litem

Neal Masciantonio, Esq.
1806 Callowhill Street
Philadelphia, Pennsylvania 19130
Attorney for Father

BY: _____

Ariel J. Bruce
Law Clerk to the Hon. Joseph L. Fernandes
First Judicial District of Pennsylvania
Family Division
1501 Arch St., Room 1431
Philadelphia, Pa. 19102
T: (215) 686-2660 | F: (215) 686-4224
Arielbruce@co urts.phila.gov